UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JOSEPH VERGA,

                Plaintiff,

   - against -

ROTTERDAM EXPRESS, HAPAG-LLOYD
AKTIENGESELLSCHAFT, XYZ
CORPORATION (1-10), and JOHN DOE
(1-10),

                Defendants.
------------------------------------------------------X

**MEMORANDUM
AND
O R D E R**
08 CV 2165 (CLP)

On May 27, 2008, plaintiff Joseph Verga commenced this action against defendants Rotterdam Express, Hapag-Lloyd Aktiengesellschaft ("Hapag-Lloyd"), XYZ Corporation (1-10) and John Doe (1-10), alleging that he suffered injuries as a result of defendants' negligent failure to uphold their duty to inspect the vessel known as the Rotterdam Express, and to provide a safe place for plaintiff to work. (Compl.[1] ¶¶ 11-22).

On May 28, 2009, defendants Rotterdam Express and Hapag-Lloyd[2] filed a motion for summary judgment, arguing that plaintiff's claims should be dismissed on the grounds that defendants did not violate any of the limited duties of care owed by vessel owners to longshore workers under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b)

---

[1] Citations to "Compl." refer to plaintiff's Complaint, dated May 23, 2008.

[2] For purposes of this motion, references to "moving defendants" or "defendants" shall henceforth refer to defendants Rotterdam Express and Hapag-Lloyd.

(2006). (Karpousis Aff.[3] ¶ 11).

On May 23, 2009, the parties consented to this Court's jurisdiction for all purposes. Presently pending before this Court is defendants' motion for summary judgment.[4]

## FACTUAL BACKGROUND

On January 24, 2006, plaintiff Joseph Verga was employed as a longshoreman by the New York Container Terminal ("NYCT"), working on the Rotterdam Express while the vessel was docked in Staten Island. (Compl. ¶ 9). Defendant Hapag-Lloyd is the owner, operator and/or charterer of the vessel Rotterdam Express. (Compl. ¶ 3). Defendants XYZ Corporations (1-5) are the vessel's owners and defendants XYZ Corporations (6-10) are the owners of the stevedoring company to whom the vessel was turned over for loading and unloading operations. (Compl. ¶¶ 4-5, 10). John Does (1-5) are the ship's officers, mates and crew, and John Does (6-10) are stevedores to whom the vessel was turned over. (Compl. ¶¶ 6-7).

Defendant alleges that toward the end of plaintiff's shift on January 5, 2006 at about 6:00 p.m., plaintiff boarded the Rotterdam Express with the purpose of setting the hatch cover for containers to be put on. (Defs.' 56.1 Statement[5] ¶ 18; Verga Tr.[6] at 35, 39, 49). The hatch cover

---

[3]Citations to "Karpousis Aff." refer to the Affidavit of John F. Karpousis, Esq., submitted to the Court in support of defendants' motion for summary judgment on May 28, 2009.

[4]Defendants' 56.1 Statement was not filed electronically or served on plaintiff until November 3, 2009, though a courtesy copy was sent to this Court on May 28, 2009. As a result, this Court allowed plaintiff to submit a response, which was filed on November 18, 2009.

[5]Citations to "Defs.' 56.1 Statement" refer to defendants' statement of material facts submitted to the Court pursuant to Local Civil Rule 56.1 on November 3, 2009.

[6]Citations to "Verga Tr." refer to the transcript of plaintiff Joseph Verga's deposition, attached as Exhibit C to the Karpousis Affidavit.

was already on the ship at the time plaintiff began his work. (Pls.'s 56.1 Statement[7] ¶ 18; Verga Tr. at 39, 49). The cargo hatch is an area of the ship infrequently traversed by members of the ship's crew because the cover is only exposed during the loading and unloading of containers, an operation undertaken solely by the stevedores. (Dalecki Decl.[8] ¶ 15). Mr. Verga testified that generally, when he is arranging container "shoes" on the hatch cover, the ship's crew is walking around the ship, although he did not know exactly where on the ship the crew members are typically located during stevedoring operations. (Verga Tr. at 26-27).

While walking across the hatch cover to set up the container "shoes," plaintiff alleges that he slipped and fell, suffering injuries to his right hand. (Defs.' 56.1 Statement ¶¶ 2, 27; Verga Tr. at 49). After he fell, Mr. Verga states that he saw that he had slipped on a brownish black spot, which he deduced to be grease. (Defs.' 56.1 Statement ¶¶ 28-29; Verga Tr. at 49). Mr. Verga described the grease spot as having been a little longer than a foot-long skid. (Defs.' 56.1 Statement ¶ 31; Verga Tr. at 75). Mr. Verga testified that he did not see the grease before he fell because he was looking straight ahead while walking across the hatch cover, and that he had no knowledge as to where the grease spot came from. (Defs.' 56.1 Statement ¶¶ 32, 35; Verga Tr. at 49, 50, 55, 75). There were no other witnesses to Mr. Verga's accident. (Defs.' 56.1 Statement ¶ 42; Verga Tr. at 55, 74). Neither the accident nor the grease spot were noted in the ship's log book. (Dalecki Decl. ¶ 18).

The section of the hatch cover where Mr. Verga slipped ("Bay 330") had been removed

---

[7]Citations to "Pl.'s 56.1 Statement" refers to Plaintiff's Response to Defendant's Statement of Material Facts, dated November 18, 2009.

[8]Citations to "Dalecki Decl." refer to the Declaration of Niklas Dalecki, dated May 27, 2009.

from the vessel earlier on the day of the accident by NYCT employees during cargo operations. (Defs.' 56.1 Statement ¶¶ 19-22; Verga Tr. at 36-37, 40-41). However, the vessel's crew was not involved in operations relating to the movement of the hatch cover. (Defs.' 56.1 Statement ¶ 20; Verga Tr. at 71-72).

As a result of his fall, Mr. Verga suffered a fracture of his right hand that did not heal properly, resulting in a ganglion formation and severe ligament damage. (Degroot Ltr. 06/19/2009[9] at 1). Mr. Verga has returned to work since the accident and has been able to fulfill all of his duties as an NYCT holdman. (Defs.' 56.1 Statement ¶ 44; Verga Tr. at 70).

Plaintiff seeks judgment, together with interest and costs of the suit. (Compl. ¶¶ 12, 14, 16, 18, 20, 22).

## DISCUSSION

Defendants move for summary judgment, arguing that there is no evidence to support a finding that the vessel breached any of its three limited duties of care owed to longshore workers.

### A. Summary Judgment Standards

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary

---

[9]Citations to "Degroot Ltr." refer to the letter submitted by plaintiff's counsel in lieu of a formal submission in opposition to defendants' motion for summary judgment, dated June 19, 2009.

judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted). To defeat summary judgment a party "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (citations omitted).

C. Liability of Vessel Owner

Plaintiff's claims against defendants Rotterdam Express and Hapag-Lloyd are governed by the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.* The LHWCA provides a cause of action for individuals injured while engaged in maritime employment on navigable waters of the United States, including longshoremen. 33 U.S.C. § 902(3)-(4) (2006). Specifically, plaintiff's claim arises under 33 U.S.C. § 905(b), which provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.

With regards to longshoremen, Section 905(b) requires a vessel owner to exercise "ordinary care" to maintain the ship in a condition that would allow "an expert and experienced stevedore [to] load and unload cargo with reasonable safety." Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 93-94 (1994). Thus, an injured longshoreman, such as Mr. Verga, may bring a negligence claim against the vessel[10] under the LHWCA, but the statute clearly provides that: "[t]he remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." 33 U.S.C. § 905(b).

---

[10]The statute defines "vessel" as including "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).

6

Although the statute does not delineate what constitutes negligence, O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64 (2d Cir. 2002), the Supreme Court, in Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156 (1981), enunciated the vessel's three limited duties as: 1) the turnover duty; 2) the active control duty; and 3) the duty to intervene.

1. Turnover Duty

The first duty described in Scindia is the vessel owner's duty to turn the ship over to the stevedoring company in such a condition as to allow the stevedore, with the exercise of "reasonable care," to "carry on its cargo operations with reasonable safety." Id. at 167. The vessel owner is also charged with warning the stevedore of any hazardous conditions on the ship that are "known to the vessel or should be known to it in the exercise of reasonable care, that would be likely encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." Id. Although the vessel owner is required to turn the ship over to the stevedoring company in a reasonably safe condition, the vessel owner is not charged with turning over to the stevedore an "absolutely safe vessel." Sinagra v. Atl. Ocean Shipping, 182 F. Supp. 2d 294, 300 (E.D.N.Y. 2001). "[W]here a danger is obvious but easily avoidable, the shipowner will not be liable for negligence." Kirsch v. Plovidba, 971 F.2d 1026, 1030 (3d Cir. 1992).

The vessel owner has a duty to warn of latent hazards, which were defined by the Court in Howlett v. Berkdale Shipping Co., S.A., as "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." 512 U.S. at 99.

7

The duty to warn of latent hazards does not, however, obligate the vessel owner to inspect the ship and cargo before turning the ship over to the stevedore for cargo operations "because any defect obvious enough for the vessel owner to detect would be discovered by a competent stevedore." Fernandez v. China Ocean Shipping, (Group) Co., 312 F. Supp. 2d 369, 375 (E.D.N.Y. 2003) (summarizing the turnover duty as discussed in Howlett), aff'd, 94 Fed. Appx. 866 (2d Cir. 2004). In Howlett, the plaintiff claimed that he slipped on a sheet of clear plastic, resulting in injuries. The court remanded the case for a further factual determination, stating that if the district court found that the plastic at issue was visible when the longshoreman slipped on it, then summary judgment in favor of the defendant would be appropriate. Howlett v. Berkdale Shipping Co., S.A., 512 U.S. at 106.

Similarly, in Albergo v. Hellenic Lines, Inc., 658 F.2d 66, 69 (2d Cir. 1981), the Court found that because it is the stevedore's obligation to clear "tripping or stumbling hazards" from work areas, the fact that there are rope cuttings on deck does not constitute a breach of the shipowner's duty. 658 F.2d 66, 69 (2d Cir. 1981) (quoting OSHA Safety and Health Regulations for Longshoring, 29 C.F.R. § 1918.1(a)). The vessel's duties to ensure safe conditions in the areas of cargo operation are also limited "[b]ecause the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow." Howlett v. Berkdale Shipping Co., S.A., 512 U.S. at 105. See Robertson v. Tokai Shosen K.K., 655 F. Supp. 152, 154 (E.D. Pa.) (holding that whereas the vessel's failure to take responsible precautions with respect to those areas of the ship that remain under the vessel's active control amounts to negligence, "[c]argo is different"), aff'd, 835 F.2d 490 (3d Cir. 1987), cert. denied, 486 U.S. 1007 (1988).

## 2. Active Control Duty

The vessel owner does not have a "continuing duty" to discover and correct hazardous conditions that develop during cargo operations. Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. at 169. Thus, to the extent that dangerous conditions develop while the vessel is under the stevedore's control during cargo operations, the vessel is not responsible. Id. at 172 (noting that "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore"). The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. However, once cargo operations begin, the vessel will be held liable for negligence "'if it actively involves itself in the cargo operations'" and as a result of its actions, a longshoreman is injured. See Gravatt v. City of New York, 226 F.3d 108, 121 (2d Cir. 2000) (quoting Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. at 167).

## 3. Duty to Intervene

The third and final duty of the vessel arises if a vessel owner has actual knowledge of an unreasonably hazardous condition in an area of the vessel under the stevedore's control, and knows that the stevedore is not exercising reasonable care to protect its employees from that risk; under those circumstances, the vessel owner must intervene. Gravatt v. City of New York, 226 F.3d at 121 (citing Scindia, 451 U.S. at 175-76). The vessel owner is obligated to eliminate obvious hazards "'only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely.'" Sinagra v. Atlantic Ocean Shipping, Ltd., 182 F. Supp. 2d at 301-302 (quoting Kirsch v. Plovidba, 971 F.2d at

9

1031). The Court in Scindia describes the requisite behavior for intervention by the vessel as "so obviously improvident" on behalf of the stevedore that the vessel owner is aware of the stevedore's inability to correct a dangerous condition. 451 U.S. at 175.

D. Analysis

Plaintiff does not allege that defendants breached the active control duty, only that they were negligent in performing the turnover duty and the duty to intervene.

1) Turnover Duty

In opposing defendants' motion for summary judgment with respect to the turnover duty, plaintiff must demonstrate that there was a hazardous condition on the ship of which the defendants had actual knowledge or about which defendants should have known, and that hazard would not have been obvious to a competent stevedore. Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. at 167.

In this case, there is no evidence indicating that the vessel's crew was aware of the oil slick prior to turnover of the ship to the stevedore. Mr. Verga testified in his deposition that he did not know where the grease came from. (Verga Tr. at 49, 55, 75). There is no notation in the ship's log book pertaining to any grease slick. (Dalecki Decl. ¶ 18). The Chief Officer of the Rotterdam Express was not informed either by the vessel's crew or by NYCT of the grease spot. (Id. ¶ 19). There is no equipment in the area of the vessel indicated by Mr. Verga as Bay 330 that could have leaked grease or oil onto the hatch cover. (Id. ¶ 14). The area of the hatch cover where Mr. Verga's accident occurred and where the grease spot was located is an area exposed only during cargo operations which were conducted solely by the stevedores. (Id. ¶ 15). Plaintiff has not challenged these facts nor has he submitted any evidence to suggest that the hazardous

condition was present prior to the turnover of the vessel to the stevedore. He also has not submitted any evidence to indicate that the vessel had actual knowledge of the grease prior to turnover.

Moreover, the grease spot, which was on the top of the hatch cover and not hidden or concealed in any fashion, does not constitute a latent hazard about which the vessel should have notified the stevedoring company. The hazard should have been obvious to the stevedore's employees and could reasonably have been dealt with by the stevedore. See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. at 101; see also Moore v. M.P. Howlett, Inc., 704 F.2d 39, 44 (2d Cir. 1983) (holding that the jury was right in finding that the shipowner had breached its turnover duty when it did not clear the ice, water, and grease that had covered the deck for three days). Plaintiff Verga testified in his deposition that he saw the brownish black spot after he fell, and deduced that he had slipped on grease. (Verga Tr. at 49). Although Mr. Verga testified that he did not see the spot before he fell, he conceded that the lighting on the hatch cover was sufficient, and that prior to falling, he was looking straight ahead and not at the ground. (Verga Tr. at 50, 73).

Defendants argue that a brownish black grease spot would be clearly visible against the orange/red color of the hatch. (Karpousis Aff. ¶ 9; Def.'s Mem. at 5; Def.'s 56.1 Statement ¶ 33). Plaintiff denies that the grease mark was visible to plaintiff or that the hatch cover was brightly colored. (Pl.'s 56.1 Statement ¶ 33). However, plaintiff testified that he saw the spot immediately after his fall. (Verga Tr. at 49). Plaintiff argues that "it is possible, and has not been disputed, that the hatch cover could have been orange, but due to wear and tear, the grease spot was blended in with parts of the hatch cover where it wasn't orange but instead metallic."

(Degroot Ltr. at 4). While plaintiff's argument is plausible, there has been no evidence in the form of photographs or witness testimony to support plaintiff's conjecture as to the possible discoloration of the hatch cover.

Plaintiff further submits that because the grease was visible, the vessel therefore had constructive knowledge of the grease and should have acted to remedy the situation. (Degroot Ltr. at 3). However, the vessel reasonably relied upon the stevedore to notice obvious hazards and respond accordingly. As the court in Kirsch v. Plovidba noted: "[I]f . . . we could assume that the oil slick were obvious to a reasonably prudent stevedore and its longshore workers but small enough to be avoided easily by skirting it, we would conclude that the stevedoring operations could be conducted safely, and hence that the shipowner was not negligent in failing to provide a safe workplace." 971 F.2d at 1030.

Plaintiff cites the standard quoted in Riley v. Battery Place Car Park, 210 Fed. Appx. 76, 77 (2d Cir. 2006), originally enumerated in Gordon v. American Museum of Natural History, 492 N.E.2d 774, 775, 67 N.Y.2d 836, 837-38, 501 N.Y.S.2d 646 (1986), as to what constitutes constructive notice. "[A] defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." (Degroot Ltr. at 3). The evidence has already demonstrated that the grease was visible to Mr. Verga after his fall. Plaintiff raises the issue of how long the grease slick had been on the cargo hatch prior to Mr. Verga's accident. Indeed, when asked if the grease looked like a "smudged grease spot" or "fresh," Mr. Verga testified that he was not sure. (Verga Tr. 50).

Even if the Court were to look favorably upon plaintiff's inference that because the "grease patch did not instantaneously materialize," it "most likely existed on the hatch cover

hours before Verga's severe injury" (Degroot Ltr. at 3), this inference is not sufficient to support a finding that the condition existed at the time of turnover or that the vessel was aware of its existence. The cargo hatch had been under the operation of the stevedore since before Mr. Verga began his shift at 12:30 p.m. (Verga Tr. at 28), and continued under the stevedore's control throughout the evening, during which time the portion of the hatch cover at Bay 330 was removed from and returned to the vessel by NYCT employees using NYCT equipment during cargo operations. (Verga Tr. at 32, 36-37, 40-41). Mr. Verga's accident occurred after approximately 6 p.m. – almost six hours hours after NYCT began stevedoring operations. (Verga Tr. at 38). Thus, plaintiff's argument that the grease spot "most likely existed on the hatch cover hours before" Mr. Verga's accident is insufficient to hold the vessel liable for breach of the turnover duty even on the basis of constructive knowledge. Constructive notice requires that a defect be visible for a length of time sufficient for the defendant to have discovered it. Riley v. Battery Place Car Park, 210 Fed. Appx. at 77 (quoting Gordon v. American Museum of Natural History, 492 N.E.2d at 775). Mr. Verga made no showing that the grease spot existed prior to defendants' turnover of the vessel, and therefore he has failed to prove that defendants had sufficient time to discover the defect.

2) Duty to Intervene

Turning to plaintiff's claim that the vessel breached its duty to intervene, defendants argue that there is no evidence that the crew acquired actual knowledge of a hazardous condition arising after the turnover of the vessel, once stevedoring operations began. Nor is there any evidence that the vessel had actual knowledge that the stevedoring company was not exercising reasonable care to protect its own employees from risk. See O'Hara v. Weeks Marine, Inc., 294

F.3d at 65 (citing Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. at 175-76).

There were no witnesses to Mr. Verga's accident (Verga Tr. at 55, 74; Karpousis Aff. Ex. D), and after the accident, Mr. Verga failed to tell any of the vessel's crew about the grease. (Verga Tr. at 52). No one from the crew reported the accident or the grease to the vessel's Chief Officer, nor was there any notation regarding the grease or plaintiff's accident noted in the ship's logbook. (Dalecki Dec. ¶¶ 18-19). The NYCT Equipment Damage and Injury Incident Report form regarding Mr. Verga's fall was not completed until January 5, 2006, the day after Mr. Verga's accident. (Karpousis Aff. Ex. D). The report states that the accident was unwitnessed and was not previously reported. (Karpousis Aff. Ex. D). The report also notes that no clean up was required after the incident. (Karpousis Aff. Ex. D).

Plaintiff argues that if the spot was clearly visible, then the crew members had actual knowledge of the grease spot, and the vessel is liable for failing to report and remedy the condition. (Degroot Ltr. at 5). However, to establish actual knowledge, it is necessary that defendant knew of the hazardous conditions. Helaire v. Mobil Oil Co., 709 F.2d 1031, 1039 (5th Cir. 1983); see also Gravatt v. City of New York, 226 F.3d at 127 n.17 (stating that under Scindia, "'should-have-known' constructive knowledge is insufficient to meet the actual knowledge requirement"). Plaintiff has submitted no evidence demonstrating that the vessel had actual knowledge of a grease condition arising during the stevedoring operation. Plaintiff's testimony that the vessel's crew was on board and walking around while Mr. Verga was working does not establish that any crew members were actually walking around near where Mr. Verga fell or that any of the vessel's crew observed the grease spot. (Degroot Ltr. at 5).

Furthermore, "mere presence of the vessel's crew on the ship . . . does not prove

knowledge of the hazardous condition." Casaceli v. Martech Intern., Inc., 774 F.2d 1322, 1330 (5th Cir. 1985) (citations omitted), cert. denied, 475 U.S. 1108 (1986). There remains no evidence in this case that the vessel acquired actual knowledge of the grease during cargo operations either by notice through the stevedore or by witnessing the grease spot on the hatch cover.

## CONCLUSION

As set forth above, there exist no genuine issues of material fact as to whether the Rotterdam Express and Hapag-Lloyd breached the limited duties of care owed by vessel owners to longshore workers under the Longshore and Harbor Workers' Compensation Act. 33 U.S.C. § 905(b). Accordingly, defendants' motion for summary judgment is granted, and plaintiff's claims are dismissed.

**SO ORDERED**

Dated: Brooklyn, New York
December 1, 2009

Cheryl L. Pollak
United States Magistrate Judge